Filed 9/18/24  P. v. Howard CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Appellant, | E082775 |
| v. | (Super.Ct.No. FSB03736) |
| DEMETRIUS HOWARD, | OPINION |
| Defendant and Respondent. | |

APPEAL from the Superior Court of San Bernardino County.  Gregory S. Tavill, Judge.  Affirmed.

Jason Anderson District Attorney, Milena Miric, Deputy District Attorneys for Plaintiff and Appellant.

Keker, Van Nest & Peters, Nicholas D. Marais, Maya James, Victor Chiu and Paul Von Autenried for Defendant and Respondent.

After a hearing on an order to show cause, the trial court granted the resentencing petition of defendant and respondent, Demetrius Charles Howard.  (Pen. Code,

§ 1172.6.)[1] The trial court vacated defendant's first degree murder conviction and death sentence. (§ 187, subd. (a).) The trial court sentenced defendant to prison for a term of two years for the remaining attempted robbery conviction. (§§ 664, 211.) Plaintiff and appellant the People of the State of California (People) contend the trial court erred by finding they failed to prove defendant acted with reckless indifference to the victim's life during the attempted robbery. We affirm the order.[2]

## FACTS

A.   <u>MURDER</u>

Mitchell Funches (Funches) visited a neighborhood of San Bernardino known as Delman Heights because his grandparents lived there. One of defendant's friends in Delman Heights was Cedric Torrence (Torrence). Torrence met Funches in approximately 1985 and met defendant in approximately 1992, when defendant was paroled after serving a sentence for an assault with a deadly weapon conviction.

During the early evening of December 6, 1992, defendant and Torrence went to a house in Delman Heights where people from the neighborhood often gathered and spent time (the house). While at the house, defendant drank alcohol and smoked marijuana. Funches arrived at the house, and he too drank alcohol and smoked marijuana. Funches and defendant spoke, apart from the group, about conducting a robbery or carjacking;

---

[1] All subsequent statutory references will be to the Penal Code unless otherwise indicated.

[2] The People's April 23, 2024, request for judicial notice is granted.

however, defendant did most of the talking. Funches agreed to go along with defendant. Torrence overheard defendant and warned "them they could get caught." "[Defendant] said he couldn't get caught, you know, or he'd go out shooting, you know, if something happened like that." Both defendant and Funches were armed with firearms and displayed their firearms while at the house. Defendant and Funches left the house together, on foot.

At approximately 6:45 p.m. on December 6, 1992, Sherry Collins (the victim), drove into a garage unit at an apartment complex. The victim was seated in the driver's seat of her car, and the victim's five-year-old daughter was in the front passenger seat. The victim parked her car inside the garage with the garage door open. As the victim opened the driver's door, defendant approached the driver's door and Funches approached the passenger door.

The victim screamed and yelled at the two men " ' "to get out." ' " The victim's daughter moved to the floorboard. The victim laid with her head and shoulders on the passenger seat, her back across the center console, and her buttocks on the driver's seat, with her legs and feet extending out of the open driver's side door, kicking defendant who was outside the car.

Funches shot the victim on the left side of her head, killing her. The passenger window by where Funches stood was closed, so the bullet shattered the passenger window, covering the left side of the victim's face and the victim's daughter in glass. The victim's daughter saw defendant holding a firearm by his abdomen.

3

Defendant and Funches fled on foot.  There is no indication of what property, if any, defendant and Funches took from the victim.  A fanny pack remained on the victim's arm.  The victim's jewelry remained on her body, including four silver necklaces, one of which had a pearl and diamond pendant; a gold tennis bracelet; and a silver watch.  The victim had $34.70 in her pants pocket.

At defendant's murder trial, the prosecutor argued a theory of felony murder with the underlying felony being attempted robbery.  Defendant was convicted and sentenced to death.

B.     FUNCHES'S STATEMENTS TO POLICE

Funches was interviewed by a detective on December 6, 1992, after killing the victim.  Funches explained that he "was walking down the street" when the victim "almost hit [Funches] with the car" as she turned into the apartment complex.  The victim "flipped [Funches] off."  Funches told the victim "fuck you too."  Funches went to the side of the victim's car and shot her.  During the interview, Funches appeared to be intoxicated or going through withdrawal, as he was shaking, repeatedly claimed to be cold, and seemed to be falling asleep.

While in jail, Funches told a sheriff's deputy, " 'I was lost and I [was] walking down the street and some lady almost hit me with her car.  She stopped the car down the

4

street so I went up to the car to tell her some shit for almost hitting me. She was trying to get something from under the seat, so I shot her.' "[3]

## C. PRETRIAL PROCEEDINGS

In 1994, during pretrial proceedings, Funches remained handcuffed because "[t]here were a number of incidents in the Municipal court. One may have involved the throwing of fecal matter." Funches had "attempted suicide several times." Funches was housed at Patton State Hospital until his competency was restored through medications. At Patton, Funches was diagnosed with "very low" mental functioning and schizophrenia. He was prescribed anti-psychotic medication.

## D. FUNCHES'S TESTIMONY

At the hearing on the order to show cause for defendant's resentencing, Funches testified that, at the time of killing the victim, he was 24 years old, a paranoid schizophrenic, and under the influence of PCP and alcohol. PCP caused Funches to have auditory and visual hallucinations. After being arrested for killing the victim, Funches went to jail and then to Patton State Hospital until he could be tried and sentenced to prison. Funches continues to receive mental health care while in prison. Funches's testimony at the hearing on the order to show cause was riddled with outbursts by Funches. For example:

---

[3] The victim had nothing in her hands, so one can infer that if, at some point, Funches saw the victim reaching under the seat, she was interacting with her daughter who was hiding on the car's floorboard.

5

"[Funches]:  Fucking stupid.

"[Prosecutor]:  As a gang member, you're not—

"[Funches]:  Stupid, man.  Ask me something else, man.  That's stupid, man.  I don't have no answer for you.

"[Prosecutor]:  Is it true that—

"[Funches]:  I don't have no answer for you, man."

E.     DR. DEUTSCH'S TESTIMONY

At Funches's murder trial, Doctor Raymond Deutsch, a medical doctor with a practice in addiction medicine, explained that PCP can cause hallucinations in stressful situations, while causing euphoria or sedation in calm situations.  Deutsch opined that killing the victim was "totally out of proportion to what was going on in the real world.  This is a classical for drugs [*sic*] that cause perceptual and thinking abnormalities and classical for impulsive behavior triggered by psycho-active drugs."  Deutsch confirmed that a person under the influence of PCP is unpredictable because PCP is typically a sedative but it can occasionally cause "rage reactions" and a "break with reality."

F.     DR. METH'S TESTIMONY

At the hearing on the order to show cause for resentencing defendant, Doctor Ernie Meth, a nuclear medicine physician, testified that he examined Funches for Funches's 1995 murder trial.  In 1995, Meth found Funches's brain activity "was markedly abnormal," in that "there were multiple areas within the brain that were . . . not functioning."  One of the areas that was non-functional manages impulse control.  Meth opined that Funches's lack of impulse control "would be dramatic," but that a

6

person having a brief interaction with him might not realize that about him. Meth further opined that, given Funches's "profound deficit" in 1995, he likely had suffered the deficit for "a while," i.e., at the time of the killing in 1992.

G.      TRIAL COURT'S REASONING

At the hearing on the order to show cause, the trial court said to the People, "I think it's a fair assessment of the evidence that [the victim] did not need to be shot for them to be successful in their crime. It was a completely unnecessary killing. Nobody was at risk of being caught, nobody was at risk, really, of getting hurt. She didn't need to be shot at all for them to take her car and take her stuff. So why was she shot? [Defendant's] counsel is offering the suggestion that she was shot because Funches had some delusional response to the drugs. And his statement, to a large extent, is consistent with that argument. They brought the doctor here, and the doctor that testified, Deutsch's testimony."

The trial court concluded that Funches "acted spontaneously and without predictability" in killing the victim. Further, the trial court found "that [defendant] and Mr. Funches were not friends. They didn't really know each other, not on any meaningful level. And there's no evidence that there was any predictability or that [defendant] would have had any reason to expect that Mr. Funches would behave the way that he did." The trial court continued, "Did [defendant] know that the firearms were likely to be used? The weight of the evidence is that he did not."

The trial court went on: "I really thought that the pivotal point was: Was there anything to indicate to [defendant] that Mr. Funches could have been predicted in any

7

way to have acted the way he did?  And I do think that the expert testimony of Dr. Deutsch and Dr. Meth, and Mr. Funches's statement at the time or on the night of the murder with his bizarre behavior here today, certainly is indicative of a complete lack of predictability.  There's nothing—there's no evidence to indicate that [defendant] would have had any reason to expect Mr. Funches to take his gun out and shoot the gun in the direction of [the victim]. . . .  There is no reason for him to have expected that.  It was completely unpredictable, in my view."  Thus, the trial court concluded that "the prosecution was unable to carry its burden."

## DISCUSSION

### A.    CONTENTION

The People contend the trial court erred by finding they failed to prove the element of reckless indifference.

### B.    LAW

A defendant qualifies for resentencing if (1) he was tried on a theory of felony murder, which defendant was; (2) he was not the actual killer, and defendant was not the killer; and (3) he could not be convicted of murder under the amended murder laws. (§ 1172.6, subd. (a).)

To prove defendant guilty of felony murder, the People had to demonstrate beyond a reasonable doubt that defendant acted with reckless indifference.  (§§ 189, subd. (e)(3), 1172.6, subd. (d)(3).)  A defendant's participation in an armed robbery, "on its own and with nothing more presented, is not sufficient to support a finding of reckless indifference to human life."  (*People v. Clark* (2016) 63 Cal.4th 522, 617.)  The

8

mens rea required is " 'knowingly engaging in criminal activities known to carry a grave risk of death.' " (*Id.* at p. 616.)

Our Supreme Court set forth factors to evaluate the element of reckless indifference. (*People v. Clark*, *supra*, 63 Cal.4th at p. 617.) One factor in particular was critical to the trial court's analysis in this case: defendant's knowledge of Funches's likelihood of killing. (*Id.* at p. 621.) "A defendant's willingness to engage in an armed robbery with individuals known to him to use lethal force may give rise to the inference that the defendant disregarded a 'grave risk of death.' " (*Ibid.*)

C.    STANDARD OF REVIEW

When the People fail to meet their burden in the trial court, and the People are the appealing party, then "we review the record to determine whether the evidence presented at trial compels a finding in favor of the [People] as a matter of law. [Citations.] The [People] must demonstrate that [their] affirmative evidence was uncontradicted and unimpeached and of such character and weight that there is no room for a trial court determination that it was insufficient to support a finding in the appellant's favor." (*In re D.C.* (2021) 60 Cal.App.5th 915, 921 [delinquency case]; see also *People v. Ortiz* (2023) 87 Cal.App.5th 1087, 1095, fn. 5 ["even if the trial court's determination is best understood as a factual finding subject to review for substantial evidence, the question before us would be whether the evidence compels a finding in favor of [the defendant] as a matter of law"]; *In re M.D.* (2014) 231 Cal.App.4th 993, 1002 [delinquency case].)

The People advocate in favor of the substantial evidence standard of review. That standard requires us to affirm when there is reasonable and credible evidence of solid value that the trial court could have relied upon in finding in favor of the prevailing party. (*People v. Cuevas* (1995) 12 Cal.4th 252, 260-261.) In the instant case, defendant is the prevailing party, but he did not bear the burden of proof in the trial court. (§ 1172.6, subd. (d)(3).) We cannot, in this court, put the burden on defendant to have substantial affirmative evidence supporting the finding in his favor. As a result, the only practical standard of review to utilize in this case is the failure of proof standard set forth *ante*. (*People v. Ortiz*, *supra*, 87 Cal.App.5th at p. 1095, fn. 5.)

D.    ANALYSIS

1.    *DEFENDANT'S KNOWLEDGE*

We examine whether the People presented uncontradicted evidence that (a) Funches had a propensity to use lethal violence and (b) defendant was aware of that propensity.

The trial court found that "[defendant] and Mr. Funches were not friends. They didn't really know each other, not on any meaningful level." Defendant testified that he did not know Funches. Both defendant and Funches were members of Blood street gangs. One could infer that, despite not knowing one another, there was a bond or level of trust between the two men due to their gang affiliations. Therefore, one could conclude that the two conspired to commit the crime together despite having just met. The evidence that Defendant met Funches the night of the killing supports the

10

conclusion that defendant was unaware of any propensity for lethal violence that Funches may have had as defendant knew little about Funches.

Defendant and Funches's conversation about committing a robbery or carjacking lasted 10 to 15 minutes, and defendant did most of the talking. Given the short duration of the conversation and defendant's dominance of the conversation, defendant would not have learned much about Funches and his propensity for lethal violence. Therefore, the evidence supports the finding that defendant had minimal information about Funches.

Funches testified that he is schizophrenic and was under the influence of PCP at the time of the killing. Deutsch explained that PCP can cause hallucinations. Meth explained that the impulse control area of Funches's brain was non-functional. If Funches were having hallucinations and responding impulsively to them, then there was no way defendant could have predicted Funches's lethal acts because his thoughts were not grounded in reality and his actions were spontaneous.

The People assert defendant was aware of a risk of violence involved in robbing or carjacking the victim because (1) defendant has a violent criminal history; (2) defendant knew he and Funches were armed; (3) defendant knew the victim would likely resist given the circumstances; (4) defendant spoke about shooting his way out if necessary; and (5) defendant brandished his firearm. The People's argument fails on two points. First, under the standard of review, the People's evidence must be uncontradicted. (*In re D.C.*, *supra*, 60 Cal.App.5th at p. 921.) The People's argument merely points to evidence that could be favorable to them. The People fail to explain in

11

what respect the record could only support a finding in their favor. Moreover, as set forth *ante*, there is evidence supporting the trial court's findings.

The second problem with the People's argument is that they do not explain how the risk associated with the armed robbery was greater than that involved in a typical armed robbery. The People fail to demonstrate why there was a grave risk of death, i.e., a risk much greater than the risk of death inherent in any armed robbery or carjacking. " '[T]he fact a participant [or planner of] an armed robbery could anticipate lethal force might be used' is not sufficient to establish reckless indifference to human life." (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*).) The People's argument establishes only that this was a typical armed robbery.

At oral argument in this court, the People stressed that defendant's talk of shooting his way out if necessary demonstrated that there was a grave risk associated with the attempted armed robbery. The evidence is as follows:

"[Prosecutor]: Did you say anything to them about getting caught?

"[Torrence]: I said—I told them they could get caught.

"[Prosecutor]: And did either one of the two respond to you?

"[Torrence]: Yes. [Defendant] said he couldn't get caught, you know, or he'd go out shooting, you know, if something happened like that."

Defendant did not fire a shot at the victim. For example, defendant did not shoot the victim's legs to stop her from kicking him. One could find that defendant's talk of shooting his way out of any problem was bravado meant to impress Torrence, and not

12

evidence of a grave risk. Due to the contradictions in the evidence, the trial court was not required to find in favor of the People.

Next, the People assert defendant was familiar with Funches because they spent the day of the killing together. The People's assertion is contradicted by the evidence. Defendant spent the time before the gathering at the house watching friends play football at a school. Funches spent that time at a house watching professional football and car racing on television. Funches met defendant at the neighborhood gathering house approximately two hours before the shooting and had a conversation for 10 to 15 minutes with defendant, during which defendant did most of the talking. Because the record supports a finding contradictory to the People's assertion, the People's argument fails.

At oral argument in this court, the People asserted that their evidence of Funches and defendant having spent the day together was more credible than the evidence of them spending the day apart. Typically, we do not resolve issues of credibility. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Additionally, because there is contradictory evidence, the trial court was not compelled to find in the People's favor.

The People assert that, during his police interview, Funches accurately recalled the victim lying across the front seats when he shot her. The People contend that evidence means Funches could not have been hallucinating at the time of the shooting. The People fail to disclose that Funches's recollection was not entirely accurate. Funches repeatedly told the detective that the victim was "leaning in the seat," at the time he shot her. The detective asked Funches if he meant the victim was lying across

13

the seats, and Funches repeated that the victim "was leaning in the seat." The victim was lying across the seat, not leaning in the seat, hence Funches's ability to shoot the left side of the victim's head.

Nevertheless, to the extent Funches's somewhat accurate recollection demonstrates he was not hallucinating, the trial court's finding still finds support in the evidence of Funches's brain damage. The impulse control center of Funches's brain is nonfunctional, which means he suffers dramatically poor impulse control. One could reasonably conclude that Funches's behavior was unpredictable due to his complete lack of impulse control. Where a person with impulse control might have hesitated to see if the victim had anything in her hand, Funches shot to kill. Thus, the trial court's finding that Funches's lethal actions were unpredictable is supported by the evidence, even if Funches's mind was rooted in reality.

The People contend it is improper to focus on Funches because the purpose of the hearing on the order to show cause is to establish defendant's mens rea and "[d]efendant created a situation that posed a grave risk of death." The People are mistaken. "A defendant's knowledge of a confederate's likelihood of using lethal force . . . is significant to the analysis of the defendant's mental state." (*Scoggins*, *supra*, 9 Cal.5th at p. 681.) Funches killed the victim. Therefore, what defendant knew about Funches prior to the killing is highly relevant to whether defendant was aware of the grave risk of death posed by Funches.

14

The People contend the trial court made errors in its findings of fact. The People assert the trial court wrongly found Funches shot across the car, toward defendant, when Funches actually shot downward toward the victim who was lying across the front seats. The People assert this error means the trial court did not have a clear understanding of how the shooting occurred. The crux of the case concerns what defendant knew about the grave risk of death posed by Funches. The physical aspects of how Funches killed the victim are not relevant in demonstrating what defendant knew about the risk posed by Funches. Therefore, there is little to be gained from examining whether the trial court erred in its rendition of how the shot was fired toward the victim.

The People assert that there is a grave risk of death anytime an intoxicated person commits an armed felony. "Reckless indifference to human life has a subjective and an objective element. [Citation.] As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.] As to the objective element, ' "[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." ' " (*Scoggins, supra,* 9 Cal.5th at p. 677.) Because there are subjective and objective components to the reckless indifference analysis, we cannot conclude that reckless indifference is proven *anytime* an intoxicated person commits an armed felony.

15

Additionally, defendant was also intoxicated. The People do not address what impact, if any, defendant's intoxication had on his mens rea and his ability to perceive Funches's level of intoxication. In other words, to argue that intoxication makes a person inherently unstable with a firearm, would then require an argument as to how defendant was sufficiently clearheaded to appreciate the risk created by Funches's intoxication. The People fail to make such an argument.

### 2. OTHER FACTORS

In the People's briefs, they address all of the reckless indifference factors. As discussed *ante*, the pivotal factor for the trial court was defendant's lack of knowledge of a likelihood of Funches using lethal force. Nevertheless, for the sake of thoroughness, we will address the remaining factors.

#### a. Preventing the Killing

Factor: "Did [the defendant] have the opportunity to restrain the crime or aid the victim?" (*Scoggins*, *supra*, 9 Cal.5th at p. 677.) On this issue, the trial court said, "[Defendant] was not in a position to prevent the death. Mr. Funches, as described, and by all appearances based on the evidence, appeared to have acted spontaneously and without predictability."

As discussed *ante*, the evidence supports the finding that defendant knew little about Funches and what, if any, propensity for lethal violence Funches had. Because defendant was unaware of a grave risk posed by Funches, and Funches acted spontaneously, defendant could not have prevented the killing.

At oral argument in this court, the People asserted that defendant's act of running from the scene after the shooting demonstrated reckless indifference to life because he did not aid the victim. The victim suffered brain death instantaneously, which means her "brain was irreversibly damaged immediately. [Although her] heart would go on beating for a few more minutes, because it can pump away independently for a while without brain function." The People did not point to evidence of what, if anything, defendant could have done to aid the victim after she suffered brain death. Because we see no evidence indicating how defendant could have aided the victim, defendant's act of leaving the victim is not compelling evidence of reckless indifference to life.

### b. Use of a Firearm

Factor: "Did the defendant use or know that a gun would be used during the felony?" (*Scoggins*, *supra*, 9 Cal.5th at p. 677.) The trial court found defendant did not know Funches would shoot the firearm. The evidence that no property was taken from the victim supports the finding that defendant was surprised by the shooting. One would expect that if defendant intended to participate in a carjacking or robbery with knowledge that a firearm would likely be fired, then he would have taken the victim's property after the shooting. Because defendant did not take any property, one could infer that he was unaware Funches was likely to fire the gun at the victim, so he was frightened after the shooting and left.

### c. Minimizing the Risk of Violence

Factor: "What efforts did the defendant make to minimize the risks of violence during the felony?" (*Scoggins*, *supra*, 9 Cal.5th at p. 677.) The trial court remarked, "I

don't really have evidence on that. I can't really say that he did or he didn't. There was violence inherent in the physical force used to try to complete the carjacking or complete the robbery. In terms of the firearm use, the defendant didn't try to minimize the firearm use, but the defendant didn't have any reason to expect that the firearm would be used."

There is little evidence of defendant's actions. The victim's daughter said she saw defendant holding a gun. Thus, there is no evidence of defendant proactively minimizing the risk of violence.

### d.    Duration of the Crime

Factor: "What was the duration of the interaction between the perpetrators of the felony and the victims?" (*Scoggins*, *supra*, 9 Cal.5th at p. 677.) The trial court said, "[I]t was a robbery/carjacking attempt . . . . Which, from the defendant's perspective, they would want that to be accomplished as quickly as possible. [¶] I think when you're talking about the duration, they're thinking about . . . lengthening the time, that lengthening increases the risk of harm. And that is not present here." The trial court continued, "They can take a 10-minute scenario . . . [¶] . . . [¶] . . . and turn it into a one-hour scenario. By doing that, you increase the risk of harm. And nothing of the sort happened in this instance."

The victim's daughter stated that as the victim open the car door, defendant and Funches approached. The victim " 'yelled at the [men] to "get out." ' " The victim was kicking defendant when Funches shot the victim. The evidence supports the finding that the incident was quick, and nothing was done to prolong the interaction.

### e.       Presence at the Killing

Factor:  "Was the defendant physically present at the crime?"  (*Scoggins*, *supra*, 9 Cal.5th at p. 677.)  The trial court found defendant was "right next to [the victim]" when Funches killed her.  The evidence reflects the victim was kicking defendant at the time Funches killed her, which supports the trial court's finding that defendant was next to the victim's feet and legs during the killing.

### f.       Number of Weapons

Factor:  "How many weapons were ultimately used?"  (*Scoggins*, *supra*, 9 Cal.5th at p. 677.)  The trial court found two firearms were involved and one was used to kill the victim.  The victim's daughter saw defendant holding his gun by his abdomen, and Funches used his gun to kill the victim.  Therefore, the evidence supports the finding that two guns were used.

### 3.       *CONCLUSION*

There is evidence contradicting the People's mens rea evidence.  In particular, there is evidence contradicting a finding that defendant knew Funches had a propensity for lethal violence.  Therefore, the trial court was not required to find in favor of the People on the element of reckless indifference.

19

**DISPOSITION**

The order is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER_____
Acting P. J.

We concur:

CODRINGTON_____
J.

RAPHAEL_____
J.

20